# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRANDON M. SIMEONE, *Administrator d.b.n. of the Estate of John Simeone, III, Deceased, on behalf of the Estate of JOHN SIMEONE, III, Deceased and Brandon M. Simeone, individually and on behalf of all the Wrongful Death Heirs*, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 10 - 224<br><br>Chief Magistrate Judge Lisa Pupo Lenihan<br><br>ECF No. 43 |
| Plaintiff, | | |
| v. | | |
| DANA PHILLIPS, *individually and in her capacity as Chief Operating Officer of Allegheny Correctional Health Services, Inc.*, ALLEGHENY CORRECTIONAL HEALTH SERVICES, INC., and ALLEGHENY COUNTY, | | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the Motion for Summary Judgment filed by Defendant Allegheny County (hereinafter "Defendant" or "Allegheny County") (ECF No. 43). Defendant has filed a Brief in Support of its Motion for Summary Judgment (ECF No. 45) and a Concise Statement of Material Facts (ECF No. 44). Plaintiff Brandon M. Simeone (hereinafter "Plaintiff") has filed a Response to the Motion for Summary Judgment (ECF No. 46), a Brief in Opposition thereto (ECF No. 49) and a Response to Defendant's Statement of Material Facts

1

(ECF No. 47). After careful consideration of the submissions of the parties, Defendant's Motion for Summary Judgment will be granted.

## I. Procedural Background

Plaintiff initiated this matter in state court and it was removed to this Court on February 17, 2010. (ECF No. 1.) The Complaint asserts that John Simeone, III (hereinafter "Decedent") was incarcerated in the Allegheny County Jail on November 25, 2007, when he hung himself in his cell with his shoelaces. Plaintiff, who is Decedent's son, named the following individuals and entities as Defendants: Ramon C. Rustin (Warden of the Allegheny County Jail), Dan Onorato (Chief Executive of Allegheny County), Bruce Dixon (Director of the Allegheny County Health Department), Dana Phillips (Chief Operating Officer of Allegheny Correctional Health Services), Allegheny Correctional Health Services, Allegheny County Health Department, and Allegheny County. All individual Defendants were sued in their individual and official capacities.

Defendants Rustin, Onorato, Dixon, Allegheny County Health Department, and Allegheny County filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 3), and said Motion was granted in part and denied in part on December 23, 2010 (ECF No. 14). By Order of Court, Plaintiff's claims against Defendants Rustin, Onorato, Dixon, and the Allegheny County Health Department were dismissed with prejudice. (ECF Nos. 14, 15.) As to Defendant Allegheny County, the only remaining claims are those asserted pursuant to 42 U.S.C. § 1983 found in Counts I and II of the Complaint.

## II. Factual Background

The following recitation of facts is adduced from the submissions of both parties. Decedent was admitted into the Allegheny County Jail (hereinafter "ACJ" or "the jail") on

November 22, 2007. Plaintiff contends that at the time Decedent was admitted, he exhibited signs and symptoms that he was suffering from severe withdrawal from an opiate addiction and such withdrawal affected his mental state and posed a threat to his own safety. Decedent was screened by medical staff upon intake at the jail and assigned to Pod 4B, the jail's intake detox pod. The level four pods are the intake pods and the inmates assigned to Pod 4B typically stay housed on that pod until they are done detoxing.

Corrections Officer Foriska was assigned to work the 3pm to 11pm shift on Pod 4B on November 25, 2007. According to Officer Foriska, he was required to make rounds once an hour from 3pm to 8pm then once every half hour starting at 8:30pm. He was relieved for his one hour lunch break by Corrections Officer Murchison at approximately 6:10pm. Shortly thereafter, Officer Murchison was notified that a pastor was on his way to the pod to conduct church service. The pastor arrived at 6:40pm and Officer Murchison announced that any inmate who wished to attend service should push their button so that she could open their cell. The button in Decedent's cell was activated but because Decedent was on disciplinary housing status Officer Murchison told him that he was not permitted to attend. Decedent's cellmate, however, was permitted to attend because he was not on disciplinary housing status.

According to Officer Murchison, Decedent became hostile and irate once he was told he could not attend service. Shouting from his cell and over the intercom, he called her numerous foul names and his yelling briefly disrupted the church service once it started at approximately 6:45pm. Officer Murchison then wrote an incident report taking away the Decedent's one hour recreation time for disrespecting an officer. At approximately 6:50pm, Officer Murchison received a call from intake for the release of two inmates and she interrupted the service to

3

announce their names. The inmates collected their belongings and she placed them in the sally port at 7pm.

Upon returning from the sally port, Officer Murchison started her security check round of all the cells. As she arrived at cell 105 she saw Decedent hanging from the upper bunk in a sitting position with two shoe laces around his neck. She quickly returned back to her desk in order to open the cell door and notify central control of a medical emergency. Inmates Martin Williamson and Brian Luczki rushed into Decedent's cell and placed him on the ground. Officer Murchison felt a slight pulse and inmate Luczki administered CPR. Medical arrived at approximately 7:15pm and Decedent was transported to UPMC Presbyterian Hospital where he was pronounced dead two days later.

### III. Standard of Review

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the

evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

## IV. Discussion

As noted above, the only remaining claims against Defendant Allegheny County are those asserted pursuant to 42 U.S.C. § 1983 found at Counts I and II of the Complaint. Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the basis that Plaintiffs have failed to demonstrate any policy or custom of Allegheny County that caused a constitutional violation.

### A. Municipal Liability

Under section 1983, a local government like Allegheny County is subject liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of by the plaintiff. Monell v. Dept. of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). The "official policy" requirement distinguishes acts of the municipality from

acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible. Id.

In finding municipal liability pursuant to § 1983, the plaintiff must identify the policy, custom or practice of the municipal defendant that results in the constitutional violation. Id. at 690-91. A municipal policy is made when a decision-maker "issues an official proclamation, policy, or edict." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990). A custom or practice, however, may consist of conduct so permanent and well-settled that it has the force of law. Id.

Finally, the plaintiff must show that, "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of rights." Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997). For determining whether a municipality should be held liable under § 1983, "deliberate indifference" is the relevant standard. This is a stringent standard of fault, requiring proof "that the municipal action was taken with deliberate indifference to its known or obvious consequence." Id. at 407 (internal quotations omitted); *see also* City of Canton v. Harris, 489 U.S. 378, 389 (1989). In other words, a plaintiff must demonstrate that a municipality had notice that a constitutional violation could occur and acted with deliberate indifference to this risk. Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000).

### B. Analysis

As the Court understands, Plaintiff seeks to hold Defendant Allegheny County liable for Decedent's suicide on the basis that Allegheny County had a custom of allowing suicide

prevention training at the jail to lapse, which caused more suicides to occur including the Decedent's. Plaintiff asserts that Defendant knew of the prevalence of inmate suicides at its jail and the alternatives for preventing them but was deliberately indifferent to the needs of its inmates by allowing a set of circumstances to exist that permitted and promoted increased chances of suicide among its inmates, particularly those similar to the Decedent.

Defendant has submitted exhibits showing that at the time of Decedent's suicide the Allegheny County Jail had a suicide policy in place which set forth the policy and procedure to address suicide and its prevention. (ECF No. 43-2.) Plaintiff does not dispute that such policy was in place but instead claims that training on the policy was allowed to lapse, which attributed to more suicides. As evidence to support this position, Plaintiff relies on a report authored by Doctor Bruce Dixon, chair of Defendant Allegheny Correctional Health Services, which is entitled "An Analysis of Jail Suicides 1981-2010." (ECF Nos. 47-1, 49-1.) According to the report, there were 47 individuals who were victims of suicide while in custody at the Allegheny County Jail: 20 suicides from 1981 through 1990; 8 suicides from 1991 through 2000; and 19 suicides from 2001 through 2010. Of the 27 individuals from 1991 through 2010, 17 of this group were on either Pods 4B or 4C, intake pods, and 16 were withdrawing from drugs or alcohol at the time of their death. Although Dr. Dixon notes that medical staff had made several changes in the few years prior to the issuance of the report to lessen the likelihood of suicide or suicide attempts,[1] he emphasized the need for correctional officer training, specifically noting

---

[1] Such changes include: (1) gowns purchased for inmates on suicide watch so that they are no longer stripped naked; (2) inmates in intake pods, and particularly those detoxing from drug use, are double celled and when possible kept in close proximity to the guard station for frequent observation; (3) a nurse is assigned to the intake pods full time for two of three shifts and makes frequent rounds and that is supplemented by intake workers who act as patient monitors; (4) better screening at intake and availability of previous records to detect previous attempts or at risk inmates; (5) information about mental health care as an outpatient has been made more readily available to medical staff; and (6) more privacy has been instituted during intake screening to allow for more information

7

that he talked to several observers who pointed out that more suicides appeared to occur during times of change in senior administration where training was allowed to lapse. In contrast, he noted that years when no suicides occurred, correctional staff received intensive training.

Plaintiff also relies on the deposition testimony of Captain Pofi (ECF Nos. 47-2, 49-3) as evidence that the county failed to take action although it was aware of the prevalence of suicides at the jail, particularly among inmates going through detox upon intake. Specifically, Captain Pofi stated that a pattern of suicides developed at the jail in young, white males, in their late twenties, early thirties, who were heroin addicts and detoxing. The men were housed in the intake/detox pods and committing suicide after approximately three to five days of detox. Following Decedent's suicide, and another that occurred shortly thereafter, new policies were implemented to help pod officers monitor inmates for suicidal behavior, specifically double celling and fifteen minute rounds by inmate workers.

Plaintiff contends that a causal relationship exists between these breaches by Defendant Allegheny County in its lax suicide prevention program and the death of the Decedent. In particular, the Decedent was housed in intake Pod 4B and was going through detox at the time he was admitted to the jail. He was a white male in his thirties and on the third day of detox at the time of his suicide. Based upon these facts, the Decedent fit the pattern discussed by Captain Pofi in his deposition regarding suicides occurring in Pods 4B and 4C. The Decedent passed away in 2007, which Plaintiff contends was during a time period where the jail saw a spike in suicides due to a lapse in suicide training. Plaintiff contends that based on Dr. Dixon's report and the evidence presented, it is reasonable for a jury to conclude that Defendant Allegheny

---

sharing between medical staff and inmates. There seems to be some confusion as to whether any of these changes were implemented prior to the Decedent's suicide.

County had a custom of letting suicide training lapse at the jail and that despite knowing about the prevalence of suicides in its jail and how to prevent them from occurring it failed to give correctional staff the necessary training to detect and alert medical personnel to potential suicides. The Court disagrees.

First and foremost, Plaintiff has not demonstrated by any means that Defendant Allegheny County had a custom allowing suicide prevention training to lapse. Plaintiff has not pointed to any evidence directly supporting his contention that there was actually a lapse in suicide prevention training and the evidence of record supports a contrary finding. While Plaintiff relies heavily on Dr. Dixon's report to support his position, and while the report does suggest that suicide training had been deficient in the past, nowhere in the report, nor anywhere else, does it state that the jail was not training its staff on suicide prevention *at the time of the Decedent's death*. The report is non-specific as to exactly when in time training was allowed to lapse and Plaintiff has not provided the Court with any evidence that it was during 2007 as he contends.

Defendant has submitted evidence demonstrating that staff received and continue to receive training, education, specialty training, retraining and annual training pertaining to all jail policies and procedures, including suicide prevention. *See* ECF No. 43-3 at 16-17; No. 43-5 at 10-15, 27; No. 49-3 at 9-10; No. 49-4 at 4-5, 8; No. 49-5 at 5, 8, 10; No. 49-11 at 6. While neither party submitted any direct evidence showing exactly when these training sessions occurred in the time preceding the Decedent's death and who participated in the training, the corrections officers and staff deposed testified that they receive mandatory training on an annual basis. *See* ECF No. 43-3 at 16-17; No. 43-5 at 11-12, 14; No. 49-3 at 9-10; No. 49-4 at 4-5; No. 49-5 at 5, 8.

9

According to the jail's suicide policy, all correctional officers and staff are trained in all areas of suicide prevention. *See* ECF No. 43-2. They are educated on a regular basis to ensure adequate understanding of depressive or suicidal behavior and work with medical personnel to identify inmates at risk for suicide. Id. According to the depositions of numerous corrections officers and staff submitted by both parties, they are taught to look for change in behavior suggesting that the inmate may be suffering from a mental health issue and to immediately contact the mental health department if they believe the inmate needs to be evaluated. *See* ECF No. 43-3 at 32; No. 43-4 at 11, 16; No. 43-5 at 12, 26-27; No. 49-3 at 9; No. 49-4 at 8-11; No. 49-5 at 7-10; No. 49-11 at 6, 9. They are also taught to immediately contact the mental health department if an inmate states, even in a joking manner, that they are going to harm themselves or someone else. *See* ECF No. 43-3 at 25-26; No. 43-4 at 16; No. 43-5 at 27; No. 43-6 at 28; No. 49-3 at 9; No. 49-5 at 10; No. 49-11 at 6. The inmate is interviewed by a medical staff member who then moves the inmate to the mental health pod if they deem it necessary. *See* ECF No. 49-4 at 9, 11; No. 49-5 at 7.

Plaintiff appears to suggest that the conduct of Officer Murchison evidences the jail's lapse in suicide prevention training among the correctional staff. Plaintiff has submitted the witness statement of Brian Luczki, the inmate on Pod 4B who administered CPR to the Decedent. (ECF No. 49-8.) Luczki stated that prior to the suicide, Decedent yelled and screamed out of his cell that he was going to "fucking kill himself" if he was not let out for church service and that Officer Murchison sat behind her desk and laughed as the Decedent threatened to take his own life. Plaintiff also contends that once Decedent was found, Officer Murchison allowed Luczki to perform CPR instead of administering it herself even though she did not know if he was trained in CPR. According to Plaintiff, a reasonable jury could conclude

that correctional staff were not trained at all based on Officer Murchison's reaction. Again, the Court disagrees.

Officer Murchison stated in her deposition that she has received yearly training since starting at the jail in 1994, including training in mental health. (ECF No. 43-5 at 11-12, 14.) She stated that she is taught to call the mental health department if an inmate presents behavior that would suggest something was problematic. (ECF No. 43-5 at 12, 26-27.) She further stated that she is trained to immediately call mental health if an inmate states even in a joking manner that he is going to harm himself and in fact she has had to do call the mental health department on several occasions when she felt that an inmate needed to be evaluated. (ECF No. 43-5 at 27; No. 43-6 at 28.) While she may not have done so in this particular situation, assuming that Luczki's version of events is correct, Plaintiff has failed to demonstrate that she did not do so due to a lack of training. Instead, the evidence in the record supports the finding that she was trained in suicide prevention. Moreover, Officer Murchison stated that she did not administer CPR because she was able to feel a pulse and did not believe CPR was necessary. (ECF No. 43-6 at 10.) She allowed Luczki to perform CPR only because Luczki stated that the Decedent was his friend and he did not want to see him die. (ECF No. 43-6 at 7, 9, 11-12.)

Nevertheless, assuming there was such a lapse in training, not all failures or lapses in training will support liability under § 1983. As the Third Circuit has explained, "municipal liability for failure to train cannot be predicated solely on a showing that the [municipality's] employees could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1029-30 (3d Cir. 1991). Rather, there must be a causal nexus between the failure to provide specific training and the plaintiff's injury and the defendant's failure to provide the

training must reflect a deliberate indifference as to whether the constitutional deprivation of that kind would occur. Id. at 1030. In a prison suicide case such as this one, a plaintiff must "(1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (2) demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives." Id. Plaintiff has not satisfied either requirement.

Plaintiff conclusively claims that there was a lapse in suicide prevention training, but he has not pointed to any *specific* training that was not provided and could have reasonably been expected to prevent the Decedent's suicide. To the extent he asserts that Officer Murchison should have notified mental health when Decedent was presumably yelling that he was going to kill himself, the evidence demonstrates that she *was* trained to do so if such a situation were to occur. The fact that she may have failed to do so despite her training does not meet the appropriate standard to establish liability with respect to Defendant.

In short, the undisputed evidence in this case is that the jail did have a suicide policy in place at the time of Decedent's death and it provided its employees with ongoing training on suicide prevention. Whether the jail should have required its employees to undergo more extensive training in the area of suicide prevention or implement additional procedures to thwart suicide attempts may have some bearing on whether Defendant acted negligently. However, it does not establish that it acted with deliberate indifference to the health and safety of its inmates, including the Decedent. Consequently, Defendant's motion will be granted. An appropriate order follows.

**AND NOW** this 13th day of November, 2012;

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Defendant Allegheny County (ECF No. 43) is **GRANTED**.

                                                                                          Lisa Pupo Lenihan
                                                                                          Chief United States Magistrate Judge

cc:   All Counsel of Record
       *Via ECF Electronic Mail*